IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

UNITED STATES OF AMERICA

v.                                CRIMINAL ACTION NO. 2:99-00012-001

CALVIN DOUGLAS DYESS

<u>MEMORANDUM OPINION AND JUDGMENT ORDER</u>

Pending before the court are defendant's motions for a reduction in sentence under amendments to the sentencing guidelines as well as under the First Step Act of 2018. For the reasons below, defendant's motion(s) are **DENIED** as to any reduction under the sentencing guidelines but are **GRANTED** under the First Step Act.

I.

"Sometime in 1996 or 1997, an investigation began into a criminal drug conspiracy in the area of Charleston, West Virginia." <u>United States v. Dyess</u>, 478 F.3d 224, 227 (4th Cir. 2007). "The investigation was a cooperative effort between the Charleston Police Department's Metropolitan Drug Enforcement [MDENT] and federal Drug Enforcement Administration (DEA) officials." <u>Id.</u> at 227-28. William Hart, a Charleston police officer, was the lead investigator on the case. <u>See id.</u> at 226.

On February 17, 1999, a federal grand jury in the Southern District of West Virginia returned a thirteen-count superseding indictment against Calvin Douglas Dyess ("Calvin" or "Dyess") and twelve codefendants.  Count Two of that indictment charged Dyess and certain of his codefendants with conspiracy to distribute and possess with intent to distribute cocaine base, cocaine, and marijuana, in violation of 21 U.S.C. § 846.  Dyess was also charged with a violation of 21 U.S.C. § 848 for engaging in a continuing criminal enterprise involving the distribution of cocaine, crack, and marijuana (Count One); money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and (h) (Count Three); aiding and abetting interstate travel to facilitate an unlawful business activity, in violation of 18 U.S.C. §§ 1952(a)(3) and (2) (Count Four); distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1) (Count Five); unauthorized use of telecommunication services, in violation of 18 U.S.C. § 1029(a)(7) (Count Six); aiding and abetting the distribution of marijuana, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count Seven); aiding and abetting possession with intent to distribute cocaine base, cocaine, and marijuana, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count Eight); being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2)

(Count Nine); and distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1) (Count Eleven).

The drug conspiracy charged in the indictment was wide-ranging, both in terms of its duration, as well as the number of participants.[1]  The indictment alleged that the conspiracy spanned more than three years, "[f]rom at least 1995 to December 28, 1998" and involved at least fourteen other people. Superseding Indictment Count Two.  A number of codefendants were related to Dyess including:  his wife, Rachel Ursala Dyess (Sentencing Tr. at 7); his uncle, Orange Dyess (Tr. at 7); nephew, Eddie Ray Dyess, Jr. (Tr. at 44, 259) and cousin, Benjamin Green (Tr. at 115).  The indictment estimated that that the income Dyess obtained and received from his crimes was in excess of three million dollars. See Superseding Indictment at 3.

On April 21, 1999, Dyess pled guilty to Counts Two and Three of the superseding indictment, the drug conspiracy and money laundering counts.  See ECF No. 800.  At his plea hearing, Dyess was informed that by pleading guilty to those counts that he would be subject to the following statutory penalties:  a

---

[1] Indicted separately in other related cases were a number of individuals involved in Dyess's criminal activity.  See Presentence Investigation Report ("PSI") at 2-5.

3

term of imprisonment of ten years to life; a fine of $4,500,000
or twice the gross pecuniary loss resulting from his conduct,
whichever is greater; a term of supervised release of five
years; a special assessment of $200, consisting of $100 for each
count of conviction; and denial of federal benefits for up to
five years.  See ECF No. 800; see also ECF No. 219.  Upon
questioning from the court, the United States informed the court
that relevant conduct for Count Two would "be well in excess of
1.5 kilograms of cocaine base" and that "[a]t the time of the
indictment, the relevant conduct developed in the testimony in
the grand jury and through physical and other evidence was at
least 1 hundred kilograms of cocaine. . . at least 80 percent of
that was converted to cocaine base." ECF No. 800 at 10.  The
court made sure that Dyess understood that, given the drug
quantities involved, he could be sentenced to life imprisonment
on Count Two.  See id. at 10-11.

> **Court:** The importance of knowing this early on with
> this conspiracy charge in count number 2, . . . is
> that if you are convicted of count 2, then you do
> expose yourself to a mandatory minimum of ten years
> and a maximum of life imprisonment and you ought to
> know that for certain going in.  Do you understand
> that?
>
> **Dyess:** Yes, sir.

Id. at 10-11.  The United States also asked "that the record
reflect that the [drug] dealing involved [in Count Two] involved

at least 50 grams or more, or more than 50 grams of cocaine base
or more than five kilograms of cocaine powder" and Dyess
admitted that the factual basis was correct.  Id. at 16.  Later
in the plea hearing, the court once again informed Dyess that,
because of the drug quantities involved, he would receive a
sentence of at least ten years and up to life.  See id. at 25-
26.

A presentence investigation report ("PSI") was prepared to
aid the court in sentencing Dyess.  According to the PSI, Dyess
was the leader of the criminal conspiracy and would recruit
individuals to travel to New York, Georgia, and Texas to obtain
cocaine, cocaine base, and marijuana for distribution.  The PSI
found that Dyess was responsible for 100 kilograms of cocaine,
eighty percent of which was converted to cocaine base.  The
probation office also maintained that Dyess was responsible for
approximately 600 to 700 pounds of marijuana.  The PSI also
estimated that Dyess received in excess of three million dollars
from his illegal activity.

After converting the cocaine and cocaine base to marijuana,
the PSI concluded that Dyess was responsible for 1,604,272.16
kilograms of marijuana.  That drug weight yielded a Base Offense
Level of 38 under the 1998 edition of the United States
Sentencing Guidelines Manual.  The probation officer also

recommended a two-level enhancement, pursuant to USSG §
2D1.1(b)(1), for possession of a dangerous weapon; a four-level
upward enhancement, pursuant to USSG § 3B1.1(a), because Dyess
was an organizer or leader of criminal activity that involved
five or more participants or was otherwise extensive; and a two-
level upward adjustment for obstruction of justice, pursuant to
USSG § 3C1.1.  The PSI did not recommend a downward adjustment
for acceptance of responsibility resulting in a Total Offense
Level of 46 for Dyess.  The PSI further found that Dyess had
five criminal history points putting him in a Criminal History
Category of III.  The guideline imprisonment range for a Total
Offense Level of 46 and Criminal History Category III was life.

Dyess raised numerous objections to the PSI and, on August
25 and 26, 1999, the court held a two-day contested sentencing
hearing for Dyess and his codefendants Orange Dyess and Eric
Spencer.  The court heard from thirteen witnesses including
codefendants, Ursala and Eddie Ray Dyess, Jr., as well as others
directly involved in Dyess's illegal activities, including
Benjamin Green, Lance Williams, Douglas Miles, Philip Weldon,
Leon Mitchell, and Richard Rogers.  Dyess argued that he should
only be held responsible for 12 to 17 kilograms of cocaine, a
hundred pounds of marijuana, and 18 to 20 ounces of crack
cocaine.  See Tr. at 427-28; see also Dyess, 478 F.3d at 229.

6

In overruling Dyess's objection to the quantity of drugs attributable to him as relevant conduct, Chief Judge Haden stated:

> [S]uffice it to say that the amounts here that are involved of marijuana, the buys and acquisitions of marijuana, cocaine powder from New York and from other places and then resulting in cooked up cocaine base or crack are immense amounts. And even crediting very conservatively the testimony that was given in this case, the defendant is at level 38.

Tr. at 428. Dyess was sentenced to a term of life imprisonment,[2] a fine of $25,000, and a special assessment of $200. See ECF Nos. 377, 385, 388.

### B.

Beginning on April 29, 2002, and while these cases were on direct appeal, the United States made a series of disclosures pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972), describing a romantic relationship between William Hart, the lead investigator on Dyess's case, and Dyess's wife, Ursala. See United States v. Dyess, 293 F. Supp.2d 675, 680 (S.D.W. Va. 2003) (Haden, J.). The district court summarized those disclosures as follows:

> Hart engaged in a personal relationship with Ursala Dyess, which began in early 1999. Ursala subsequently

---

[2] Dyess was sentenced to life on Count Two and 108 months on Count Three, sentences to run concurrently. See ECF No. 388. He was also sentenced to a term of supervised release of three years on that count. See id.

7

divorced Calvin and she and Hart were married in July 2001. By December 2001 Hart and Ursala were in the process of divorce. On December 10, 2001 Ursala met with an FBI agent in the presence of a United States Attorney and Ursala's counsel. In the interview, Ursala admitted she and Hart began a personal and sexual relationship in approximately February 1999. According to Ursala, Hart encouraged her to lie to the Court, brought her statements of other witnesses to memorize and coached her testimony. When Ursala was given a polygraph in early February 1999 concerning whether she had retained any drug assets, she failed the examination, but Hart withheld the findings from the United States Attorney. Ursala further alleged that when she provided eighty thousand dollars ($80,000.00) in drug assets to Hart and his partner, Detective George Henderson, Hart allowed her to keep for her own use approximately twenty-seven thousand dollars ($27,000.00). On February 4, 1999 Hart turned in forty-one thousand six hundred thirty dollars ($41,630.00) to the United States. According to Ursala's version, eleven thousand three hundred seventy dollars ($11,370.00) of the eighty thousand dollars ($80,000.00) remains unaccounted for.

The disclosures confirm Ursala, at Hart's request, was given a polygraph on February 2, 1999. The test results, which indicated deception, were not disclosed by Hart to the United States Attorney until December 11, 2001. Hart later admitted allowing Ursala and co-defendant Ben Green to keep some amount of money. Hart's partner Henderson confirmed they allowed Ursala to keep money, which he estimated did not exceed three thousand dollars ($3,000.00).

Also among the disclosures are FBI interviews with Ursala in which she claimed Hart told her he would make sure Calvin would never get out of jail or hurt her. According to Ursala, Hart also promised her she would not go to jail because he was the lead officer in the case and could do whatever he wanted. After Ursala was sentenced to probation, she alleges Hart later threatened he had obtained probation for her and he could get her taken off probation.

Id. at 680-81.

Also during this time frame, Dyess's codefendant, Eric
Spencer, presented affidavits from fellow codefendants Lori
Nicole Cummings and Benjamin Green, Jr. swearing that "Hart
suborned their perjury with threats and promises."  Id. at 681
n.7.  Spencer also offered an affidavit from Terryonto McGrier,
indicted in another case, as well as a sworn statement by Marlon
Rush, alleging misconduct by Hart.  See id.  "Additionally, an
affidavit, similar in appearance to those of Cummings and Green,
prepared for co-Defendant Eddie Ray Dyess (Eddie) and making
similar allegations, was presented to Eddie's probation officer.
Eddie refused to sign the document because he acknowledged it
was false.  He then gave the unsigned affidavit to his probation
officer who provided it to the court."  Id.

In light of the government's disclosures, the United States
Court of Appeals for the Fourth Circuit remanded Dyess's case,
as well as those of Eric Spencer, Michael Jason Bartram, and
Orange Dyess, directing the "district court to conduct further
proceedings as it may deem appropriate."  Id. at 681.  Because
of the "potential appearance of impropriety", the court
disqualified the Office of the United States Attorney for the
Southern District of West Virginia and the United States
Attorney for the Eastern District of Virginia was appointed to

9

represent the government in further proceedings.  See id. at
682.

     Upon remand, Dyess, Spencer, Orange, and Bartram moved for:

     1) an evidentiary hearing for the presentation
     of evidence raised by the Government's disclosures and
     attendant events; 2) dismissal of the indictments
     based on outrageous Government conduct; or 3)
     permission to withdraw pleas based on the Government's
     breach of plea agreements and because the pleas were
     not knowing and voluntary, or 4) vacating the
     judgments of conviction and sentencing previously
     imposed and resentencing Defendants with downward
     departures based on Government misconduct.

Id. at 682.  The court denied defendants' motion to dismiss the
indictments and/or withdraw their guilty pleas.  See id. at 693.
It did, however, grant defendants' "motion for an evidentiary
hearing to determine whether the alleged misconduct by Hart,
Henderson, and Ursala or the purported recantations by Benjamin
Green and Lori Nicole Cummings undermine the factual basis for
sentencing guidelines calculations in the cases of Calvin,
Spencer, and Orange."  Id. at 693-94.  According to the court, a
hearing would provide the court an opportunity to determine (1)
which testimony should be credited, (2) which witnesses perjured
themselves and, if so, when, and 3) "whether perjury was done in
the courtroom or in their after-thought sworn statements."  Id.
at 692.

On July 9, 2004, the court conducted the evidentiary hearing.[3]  See ECF Nos. 994, 1001.  The parties were advised "that the sole purpose for the hearing was to determine whether the alleged misconduct by Hart, Henderson, Rader, or the purported recantations by Green and Cummings undermine the factual basis for the original sentencing guideline calculations in the defendants' cases."  ECF No. 1001 at 2.

Hart was called as a witness at the hearing but he asserted his rights under the Fifth Amendment not to testify.  See ECF No. 994 at 5; United States v. Dyess, 478 F.3d 224, 233 n.14 (4th Cir. 2007).  The court was asked to and did consider that a criminal information had been filed against Hart for his conduct in the case of Dyess and his codefendants.  See ECF No. 994 at 5-6.[4]  As for Hart's impact on Dyess's sentence, the court concluded:

> Based on the court's review of the record in these cases, it is clear that Hart had an inappropriate relationship with [Ursala] that compromised his role as an investigative officer. Hart has now tendered a guilty plea to an offense based upon his conduct in this matter, the court has

---

[3] Upon the death of Judge Haden, the matter was reassigned to the undersigned who conducted the evidentiary hearing and has presided over all subsequent matters.

[4] On June 15, 2005, Hart pleaded guilty to a single count of making an unauthorized conveyance of money of the United States not in excess of $1,000.00 to another person, in violation of 18 U.S.C. § 641.  See Dyess, 478 F.3d at 233 n.14.

conditionally accepted his plea, and sentencing is
scheduled for March 25, 2005.  There is no evidence
before the court that Hart's misconduct compromised or
tainted the testimony of any other witnesses at the
original sentencings.

ECF No. 1001 at 6.

Henderson was also called to testify at the hearing but he,
like Hart, asserted his Fifth Amendment right not to testify.
See ECF No. 994 at 6.  Henderson did testify about standard
practices regarding seized drug and buy money but he did not
offer any testimony regarding the drug quantities used to
determine the sentences of Dyess and his codefendants.

At the hearing, Ursala admitted "that some of her original
testimony was orchestrated by Hart and that he showed her
statements of other witnesses to ensure consistency."  Dyess,
478 F.3d at 233.  Ursala "also testified that Hart had prepared
the demonstrative exhibits used by the government at
sentencing."  Id.  "Throughout the hearing, the government did
not contest the defendants' position that [Ursala]'s prior
testimony should no longer be credited."  Id.; see also ECF No.
1001 at 3.  The court's review of Ursala's grand jury testimony
confirmed as much.  See ECF No. 1001 at 3.  The government
conceded that Ursala's testimony had been undermined but
maintained that there was sufficient evidence apart from her
testimony to support the original sentences imposed.  See id. at

12

3-4.  Regarding the effect of Ursala's testimony on Dyess's

sentence, the court concluded:

> [Ursala] testified during the defendants'
> consolidated sentencing hearing.  She used
> demonstrative exhibits to testify about drug
> quantities, including Government Exhibit 3, which
> purportedly represented the amount of crack cocaine
> she saw on a cookie sheet at an apartment on Roxalana
> Road occupied by defendant Calvin Dyess, defendant
> Spencer, and Lance Williams.  [Ursala] also testified
> that she saw cocaine powder on the kitchen counters.
> While there are allegations about Hart's role in
> creating Government Exhibit No. 3, the testimony of
> Lance Williams corroborated [Ursala]'s testimony with
> regard to these drug quantities.
>
> Williams, whose testimony has not been
> challenged, testified that Government Exhibit No. 3
> represented about 250 grams of cocaine.  He stated
> that at the time [Ursala] came to the apartment, in
> addition to crack cocaine on a cookie sheet, cocaine
> powder was also present.  Because Williams testified
> to the same quantities as [Ursala], the court
> concludes that the drug quantities to which [Ursala]
> testified have not been contradicted.  [Ursala]'s
> testimony, therefore, does not compromise the factual
> basis for Judge Haden's original sentences as they
> relate to drug quantities.
>
> Additionally, the drug quantities established by
> other witnesses who testified at the defendants'
> consolidated sentencing hearing significantly exceed
> the 1.5 kilograms of crack cocaine Judge Haden used to
> sentence the defendants.  The court concludes that,
> since there is ample evidence in the record to support
> the guideline calculations Judge Haden used to
> sentence the defendants, the problems surrounding
> [Ursala]'s inappropriate relationship with Hart are
> not sufficient to mandate resentencing.

ECF No. 1001 at 4-5.

As for Benjamin Green's affidavit, the government asked the

court to take judicial notice of the fact that Green had
subsequently recanted the affidavit he filed in Calvin Dyess's
case and entered into a plea agreement with the United States.
See ECF No. 1001 at 8.[5]  The court did so and determined that,
while Green's testimony was impaired, it did not undermine the
drug quantities attributed to Dyess at his original sentencing.

> According to the statement of facts attached to
> Green's plea agreement, Green admitted that defendant
> Calvin Dyess drafted the affidavit he signed.
> Moreover, Green declared that the statements regarding
> Hart in his affidavit were false.  Notwithstanding
> this evidence, throughout the evidentiary hearing, the
> defense did not offer any other evidence that
> undermines or contradicts Green's original testimony
> at the defendants' consolidated sentencing hearings.
> Green's credibility has certainly been impaired, but
> his testimony at the original sentencings, as it
> relates to drug quantities, is supported by other
> witnesses who have not been successfully impeached.

ECF No. 1001 at 9.

Lori Nicole Cummings, a codefendant in the criminal case,
testified at the evidentiary hearing.  See ECF No. 1001 at 9;
ECF No. 994 at 75.  Although Cummings had not testified at

---

[5] Green was charged in a five-count indictment with three counts
of perjury, in violation of 18 U.S.C. § 1621, and two counts of
false declaration, in violation of 18 U.S.C. § 1623.  See ECF
No. 1 in Criminal Case No. 2:04-cr-0001.  Green pled guilty to
Count Three charging him with perjury for submitting the false
affidavit.  See ECF No. 14 at 1 in Criminal Case No. 2:04-cr-
0001.  On July 8, 2004, he was sentenced to a term of
imprisonment of five years, to run consecutive to the
undischarged term of imprisonment he was already serving.  See
ECF No. 20 in Criminal Case No. 2:04-cr-0001.

14

Dyess's sentencing hearing, she had appeared before a grand
jury.  On the stand, Cummings testified that she had not
prepared the affidavit that she filed in Dyess's case.  See ECF
No. 994 at 80-81.  Cummings assumed that Dyess had prepared the
affidavit because he told her he had.  See id.  Cummings
testified that, at the time of her arrest in December of 1998,
she had been Calvin's girlfriend for about four years.  See id.
at 75.  Cummings admitted that parts of the affidavit were false
but she signed it because Calvin told her "it would help [her]
if it helped him."  See id. at 84.  Cummings testified that
Calvin told her they would be together if he was released.  See
id. at 85.  Cummings was charged in a two-count superseding
indictment with making false declarations, in violation of 18
U.S.C. § 1623(a) and (c).  See ECF No. 20 in Criminal Action No.
2:04-cv-0002.  She pled guilty to Count Two of that superseding
indictment and was sentenced to a term of imprisonment of six
months.  See ECF No. 43 in Criminal Action No. 2:04-cv-0002.

  After the evidentiary hearing, in a written opinion, the
court denied defendants' motions to vacate their sentences and
to be resentenced.  See ECF No. 1001.  In doing so, the court
wrote:

> The defendants' sentences were based on a drug
> quantity of 1.5 kilograms of crack cocaine.  The drug
> quantity supported by the testimony of Williams, Eddie

15

Ray Dyess, Myles, Weldon, Mitchell, and Cole
significantly exceeds the 1.5 kilograms of crack the
court used to sentence the defendants.  Furthermore,
the record demonstrates that during the course of the
investigation the government seized 1.1 kilograms of
crack cocaine that may or may not be included in the
1.5 kilograms of crack cocaine the court used to
sentence the defendants.

The record also shows that defendant Spencer did
not contest the 1.5 kilograms of crack cocaine for
which he was held responsible.  In fact, during his
post-plea debriefing and at sentencing, he admitted
that the conspiracy involved 12 to 17 kilograms of
cocaine powder. . . .  Consequently, the court
concludes that there is ample testimony in the record
that has not been contradicted to support the original
sentences of Judge Haden.  Therefore, the court
concludes that, in spite of the credibility problems
of [Ursala] Rader, Hart, Henderson, and Green, the
original sentences are supported by abundant credible
evidence.

ECF No. 1001 at 10-11.

Dyess appealed.  See Dyess, 478 F.3d 224.  In affirming the

district court, the appeals court echoed the lower court's

finding that "'the drug quantities established by other

witnesses who testified at the defendants' consolidated

sentencing hearing significantly exceed the 1.5 kilograms of

crack cocaine' which served as the grounds for the sentences."

Id. at 233.

II.

Ordinarily once a sentence is imposed, it is final.  See 18

U.S.C. § 3582(b) and (c).  However, as part of an effort to

correct significant disparities in the treatment of cocaine base

(also known as crack cocaine) as compared to powder cocaine, the

federal drug sentencing landscape has changed drastically since

Dyess was sentenced.  See United States v. Wirsing, 943 F.3d

175, 176-77 (4th Cir. 2019).  In Wirsing, the United States

Court of Appeals for the Fourth Circuit provided a comprehensive

examination of these changes and their origins:

> The disparity between crack and powder cocaine
> originated in a statute:  The Anti-Drug Abuse Act of
> 1986. Kimbrough v. United States, 552 U.S. 85, 87 128
> S. Ct. 558, 169 L. Ed. 2d 481 (2007).  The Anti-Drug
> Abuse Act introduced mandatory minimums for offenses
> involving specified weights of particular drugs. . . .
> For example, a defendant convicted of an offense
> involving "5 kilograms or more of a mixture or
> substance containing a detectable amount of . . .
> cocaine" or "50 grams or more of a mixture or
> substance . . . which contains cocaine base" was
> subject to a ten-year mandatory minimum sentence. . .
> .  Similarly, the statute mandated a five-year minimum
> sentence where the conviction related to 500 grams or
> more of powder cocaine or 5 grams or more of cocaine
> base. . . .  Thus, the 1986 statute provided that "a
> drug trafficker dealing in crack cocaine [was] subject
> to the same sentence as one dealing in 100 times more
> powder cocaine." Kimbrough, 552 U.S. at 91, 128 S.
> Ct. 558.  The Sentencing Guidelines then incorporated
> this ratio "for the full range of possible drug
> quantities." Id. at 97, 128 S. Ct. 558 (citation
> omitted); see Dorsey v. United States, 567 U.S. 260,
> 267-68, 132 S. Ct. 2321, 183 L. Ed. 2d 250 (2012).
>
> The 100-to-1 ratio came under heavy criticism.
> See Dorsey, 567 U.S. at 268, 132 S. Ct. 2321;
> Kimbrough, 552 U.S. at 97-100, 128 S. Ct. 558.  For
> example, between 1995 and 2007, the United States
> Sentencing Commission issued four reports to Congress
> advising that "the ratio was too high and

unjustified." <u>Dorsey</u>, 567 U.S. at 268, 132 S. Ct. 2321.  First, "research showed the relative harm between crack and powder cocaine [was] less severe than 100 to 1."  <u>Id.</u>  In fact, "[t]he active ingredient in powder and crack cocaine is the same"; the difference is in how the drugs are ingested, with crack "produc[ing] a shorter, more intense high." <u>Kimbrough</u>, 552 U.S. at 94, 128 S. Ct. 558.  Second, "the public had come to understand sentences embodying the 100-to-1 ratio as reflecting unjustified race-based differences." <u>Dorsey</u>, 567 U.S. at 268, 132 S. Ct. 2321.  Additionally, the 100-to-1 disparity "mean[t] that a major supplier of powder cocaine [could] receive a shorter sentence than a low-level dealer who b[ought] powder from the supplier but then convert[ed] it to crack." <u>Kimbrough</u>, 552 U.S. at 95, 128 S. Ct. 558; <u>see also</u> <u>id.</u> at 98, 128 S. Ct. 558.

The Supreme Court mitigated the harshest effects of this sentencing regime in its <u>Booker</u> and <u>Kimbrough</u> decisions.  In <u>United States v. Booker</u>, the Supreme Court held that the Guidelines were "effectively advisory"; that is, a sentencing court was required "to consider Guidelines ranges," but it could "tailor the sentence in light of other statutory concerns as well."  543 U.S. 220, 245, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005).  Then, in <u>Kimbrough v. United States</u>, the Court held that a sentencing judge could find "that, in the particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing.  In making that determination, the judge may consider the disparity between the Guidelines' treatment of crack and powder cocaine offenses."  552 U.S. at 91, 128 S. Ct. 558 (citation omitted) (quoting 18 U.S.C. § 3553(a)). After <u>Booker</u> and <u>Kimbrough</u>, some district courts opted "to vary from the crack cocaine Guidelines based on policy disagreement with them." <u>Spears v. United States</u>, 555 U.S. 261, 264, 129 S. Ct. 840, 172 L. Ed. 2d 596 (2009) (per curiam) (emphasis omitted) (affirming district courts' authority to vary from the Guidelines in this way).  But not all district courts did so, and all courts remained bound by the disparate mandatory minimums imposed by the statute.

Congress addressed the 100-to-1 sentencing inequity with the August 3, 2010 enactment of the Fair Sentencing Act . . . [of] 2010.  The Fair Sentencing Act described itself as intended "[t]o restore fairness to Federal cocaine sentencing." Id., 124 Stat. at 2372.  In a section labeled "Cocaine Sentencing Disparity Reduction," the Fair Sentencing Act increased the quantities applicable to cocaine base to 280 grams for the ten-year mandatory minimum and to 28 grams for the five-year mandatory minimum. Id. § 2, 124 Stat. at 2372 (codified at 21 U.S.C. § 841(b)(1)).  "The effect of the changes [in Section 2 of the Fair Sentencing Act] was to reduce the sentencing disparity between crack cocaine offenses and powder cocaine offenses by lowering the crack-to-powder ratio from 100-to-1 to 18-to-1." United States v. Black, 737 F.3d 280, 282 (4th Cir. 2013). . . .

The Supreme Court later held that the new penalty provisions applied to all crack cocaine offenders sentenced on or after August 3, 2010, even if they committed their offense before that date. Dorsey, 567 U.S. at 264, 132 S. Ct. 2321.  Those sentenced prior to the Fair Sentencing Act's enactment, however, could not benefit from the reduction in sentencing disparities unless they could successfully bring a motion under the narrow exception provided by 18 U.S.C. § 3582(c)(2). See Black, 737 F.3d at 282, 286-87.

Generally, a court "may not modify a term of imprisonment once it has been imposed."  18 U.S.C. § 3582(c).  However, "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission . . ., the court may reduce the term of imprisonment," subject to some restrictions listed in the statute. Id. § 3582(c)(2).

After Congress enacted the Fair Sentencing Act, the Sentencing Commission promulgated amendments to "lower[] the base offense levels assigned to different amounts of cocaine base," including Amendments 750 and 782. United States v. Peters, 843 F.3d 572, 575 (4th Cir. 2016).  The Commission provided that these

Guidelines amendments applied retroactively. Thus, some defendants sentenced before August 3, 2010, could seek relief, not directly under the Fair Sentencing Act, but indirectly by means of a § 3582(c)(2) motion related to one of the retroactive Guidelines amendments. See Peters, 843 F.3d at 574-75. However, a reduction under § 3582(c)(2) was not authorized if the Guidelines amendment "d[id] not have the effect of lowering the defendant's applicable guideline range." U.S. Sentencing Guidelines Manual § 1B1.10(a)(2)(B). Thus, those defendants who were sentenced before August 3, 2010 and whose applicable Guideline range was not lowered by one of the Guidelines amendments continued to have no way to access the benefits of the Fair Sentencing Act.

In some cases, these excluded individuals were defendants who almost certainly would not have faced a different sentence if they had been charged, convicted, and sentenced after the Fair Sentencing Act. E.g, Peters, 843 F.3d at 577, 581 (affirming the district court's denial of the defendant's § 3582(c)(2) motion based on Amendment 782 because the amendment did not impact his Guidelines range, given the massive quantities of cocaine base involved). . . .

Against this background, Congress enacted the First Step Act in December 2018. The First Step Act filled some gaps left by the Fair Sentencing Act. . . .

The First Step Act provides that a sentencing court "may, on motion of the defendant, the Director of the Bureau of Prisons, the attorney for the Government, or the court, impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 were in effect at the time the covered offense was committed." First Step Act § 404(b), 132 Stat. at 5222 (citation omitted). A "covered offense" is "a violation of a Federal Criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010, that was committed before August 3, 2010." Id. § 404(a), 132 Stat. at 5222 (citation omitted). Among other limitations,

> Congress left the decision whether to grant a sentence
> reduction to the district court's discretion.  Id. §
> 404(c), 132 Stat. at 5222 ("Nothing in this section
> shall be construed to require a court to reduce any
> sentence pursuant to this section.").

Wirsing, 943 F.3d at 177-79 (cleaned up).  As Wirsing makes
clear, eligibility for sentence reductions pursuant to the
guidelines amendments relies on a change in a defendant's
recalculated guideline range while eligibility under the First
Step Act turns on the offense of conviction.

III.

Dyess is eligible for a sentence reduction under the
amendments to the guidelines if, and only if, he "has been
sentenced to a term of imprisonment based on a sentencing range
that has subsequently been lowered by the Sentencing
Commission."  18 U.S.C. § 3582(c)(2).  Therefore, Dyess's
eligibility for a sentence reduction under Amendment 782 "turns
solely on whether he is responsible for at least 25.2 kilograms
of cocaine base." United States v. Peters, 843 F.3d 572, 577
(4th Cir. 2016).  "If so, he still receives the maximum offense
level, and Amendment 782 does not alter his Guidelines
sentencing range—thus precluding him from a sentence reduction
under § 3582(c)(2)."  Id.

In arguing that he is entitled to a reduction under
Amendment 750 or Amendment 782, Dyess maintains that the amount

21

of drugs attributable to him as relevant conduct is 1.5 kilograms of cocaine base.[6]  In support of his position, Dyess maintains that:  1) the court failed to make a specific finding as to the amount of drugs attributable to him at his original sentencing; and 2) in denying Dyess's motion for resentencing on remand, the court determined the relevant conduct to be 1.5 kilograms of cocaine base when it concluded "that the drug quantities established by other witnesses who testified at the defendants' consolidated sentencing hearing significantly exceed the 1.5 kilograms of crack cocaine" which served as the grounds for the sentences.  ECF No. 1001 at 5.  Dyess's argument fails for several reasons.

First, the court did make a specific finding as to the amount of drugs attributable to Dyess at his original sentencing.  The presentence report found Dyess to be responsible for twenty kilograms of cocaine, eighty kilograms of cocaine base, and 272.16 kilograms of marijuana.  Dyess objected to this amount.  Whereupon, the court held a two-day sentencing hearing where it heard from multiple witnesses regarding the extent of Dyess's drug conspiracy.  Dyess's attorney maintained

---

[6] In the alternative, Dyess argues that the court could base his drug weight on his proffer wherein he "admitted to purchasing and distributing the following totals:  12 to 17 kg of cocaine,

his objection at sentencing and the court explicitly overruled
it.

**Dyess:**    Your Honor, during the pendency of this
action, there have been in the probation reports,
there have been certain allegations made by various
people which have been totaled up to amount to a very
large amount of coke.  The method of calculation of
that was extremely vague.  In other words, there was a
trip a month or a trip every two weeks and you got so
much each time.

From the defendant's point of view, there was not
much of a way to attack that situation or explain to
the Court how it would be less than that until today's
evidence that came in.  Something then began to
concern me. . . .  The government's exhibit 4 is an
analysis, Your Honor, of that cocaine that was found
in the locker by Eddie Dyess that Calvin - - he said
he sent him out to get the money and he found the
cocaine there.

The cocaine that was there, we have no reason - -
there is no evidence to - - been presented any place,
either in the investigation that I find or the
investigation reports that I have run or gone through
to indicate some type of calculations other than the
fact that the probation officers found some hundred
plus kilos of coke.

As the court is well aware, a kilo is sold in
various degrees of purity.  Apparently, there is no
evidence pro or con on this situation except this one
document, and this one document indicates that the
purity of the coke that was found in the locker was
some 9.6 percent or approximately ten percent coke.

Now, we talked on the witness stand today with
this independent dealer who said that the coke he got
from this group was a little more expensive than what
he would have to go if he went to New York to get it,

---

a hundred pounds of marijuana, and 18 to 20 ounces of crack
cocaine." Dyess, 478 F.3d at 229.

so I think it would be reasonable to assume that the coke that was here is the same coke that is there, and was the same coke that was purchased in New York. And if it's only of that much less purity, if it's only a ten percent pure situation, then this whole thing is - - I think is - - points up the fact that on the amount of relevant conduct - - the amount of the basic offense - - and there is no question that - - and I don't want to argue that this defendant is not a drug dealer, he is, he's admitted. But the amount of drugs involved - - I think he has a right, Your Honor, to have some degree of specific - - I can't pronounce the word - - definiteness of the underlying charge and I am not - - he has pled guilty to two counts of carrying one I think of a minimum of 20 years.

But when you hit somebody with a hundred and - - a hundred plus kilos on the strength of, well, we made so many trips, we don't know how pure it was, the only evidence is that which was admitted today by the state (sic), I don't know of any other evidence giving the purity of it, I just feel that the findings by the government of a hundred plus kilos are - - or the finding by the probation officer of a hundred plus kilos is grossly unfair. And I would move the Court to apply the proof, documented proof to that basic amount involved.

* * *

**Government:**    Your Honor, I am not sure what number the defendant is suggesting is an appropriate calculation. Leon Mitchell testified today that the appropriate calculation was somewhere between 75 and a hundred kilograms of cocaine at least 50 percent of which was converted to crack cocaine. He was arrested in June of 1998. You would have to consider some additional amount for all the trips that were taken in 1999, including the trips to Texas. So, even if the Court were to reduce that by the lowest figures, I think the amount is still, as the Court pointed out, a tremendous amount of drugs and way, way over the 1.5 kilograms of cocaine base that implicates the mandatory minimum or the level 38 basic offense level, which the defendant has contested in the presentence

24

report.  He maintains his relevant [conduct] was 12 to
17 kilograms of cocaine and that he was involved in
approximately 18 to 20 ounces of crack, which is
amazingly similar to the government's exhibit that was
submitted to the Court, the letter that was found in
the jail.

I think the evidence presented by the United
States is overwhelming that the defendant's conduct is
much, much greater than that.  Even if the Court were
to reduce it significantly, say by half, it would
still be 50 kilograms and I think it would be well
supported by the report.

**Court:**    Of equivalency?

**Government:**    I'm sorry?

**Court:**    What would be the marijuana equivalency?

**Government:**    I think it would be - - if we had 50
kilograms of cocaine, I think we would have - - first
of all, I think we would have to convert that.

**Court:**    And the marijuana and the cocaine base.

**Government:**    We would have to convert it all and I
think it would all still be in a range that would
implicate at least a level 38.  I don't think there is
anyway beyond - - there is no way that the defendant
can seriously consider or I don't think that the
defendant can seriously suggest that he should be
accountable for less than 1 point or less than 30,000
kilograms of marijuana, which is the base offense
level of 38.  Anyway that the evidence is sliced, it
seems that that would be the very least that the
defendant should be held accountable for.

\* \* \*

**Dyess:**    Your Honor, one other aspect of this hundred
plus kilos is that is supposed to be all that was
brought back.  Now, the evidence is that many people
had cuts in that.  I think my client admitted
somewhere between, what, 20 and 40 kilos, wasn't it?

I think he admitted between 17 and 20 or 17 and 30
that was his.  That's a large amount of coke and the
rest of it - - and all the evidence that we have had,
Your Honor, that has come in has been that it has been
split up, that various people had various parts in it.
We don't know what part they had.

The only evidence - - there is no evidence direct
on this as to how much Calvin Dyess personally
purchased other than his own statements and objections
and statements that he has made in his presentence
reply.  The rest of it is a bulk situation for the
entire time that went to everybody.  This is where - -
he didn't go put - - take his money and go buy it,
they pooled their money and bought it.  We don't know
how much he did.  But the only evidence of how much
was there is no question that it was split up.  That's
not a question.

The only amount that is in the record anyplace,
Your Honor, as to how much this defendant was
responsible for is - - 17 to 20 or 17 to 30 kilograms
or kilos.

**Court:**    Well, I think I understand your argument.
The issue of whether or not the drug was stepped on or
cut to enhance further sales is not one that has been
an issue in this case at all until this point and no
particular analysis was engaged in.  But suffice it to
say that the amounts here that are involved of
marijuana, cocaine powder from New York and from other
places and then resulting in cooked up cocaine base or
crack are immense amounts.  And even crediting very
conservatively the testimony that was given in this
case, the defendant is at level 38.

The testimony of others who attribute more
product or contraband to the defendant than he admits
to is also corroborated by the fact that over $300,000
in cash was acquired from - - from this defendant and
he has never had a job, and the evidence was strong
that he had a heavy lifestyle and expended a lot of
money.  And so when you consider the drug evidence and
the cash amounts that were recovered, it is entirely
consistent that this was a long time successful drug

conspiracy which your client, . . . is - - was at the
top of that organization.  And he was knowledgeable,
he sent others out to do his bidding and, of course,
when he puts drugs out on consignment and expects to
get his money back, he expects the street dealer to
step on it or cut it and sell it for whatever the
street dealer can do it. That's what makes an
organization like this successful.

This was successful.  It was long, and the
amounts involved were very significant indeed.  **So I
overrule your objection.  I believe the government has
proven its case by a preponderance of the evidence on
the amounts** and the fact that some of those amounts
were enhanced by cutting them does not diminish the
enormity of this conspiracy.

**Dyess:**    If I may just say one thing, Your Honor.
$300,000 is a lot of money, but in the drug industry,
based upon the testimony and the statements that have
been given, $300,000 is only - - it's less than 15
kilos.

**Court:**    Well, that might be.  But you are also
dealing with a young person who claims not to have
been very heavily involved, who spends a lot of money,
and yet has 300,000 around in various caches available
for certain thing. . . .  That is remarkable.

Tr. at 423-30 (emphasis added).  The foregoing establishes that

the court considered Dyess's objection to the drug quantity but,

nevertheless, overruled it based upon the evidence presented to

it.  The district court also made clear that it did not think

much of Dyess's proffer as to the amount of drugs that should be

attributed to him.

Well, the matter of acceptance of responsibility is
addressed to the sound discretion of the Court. . . .
And any time that a defendant is entitled to a benefit
of the doubt in that regard, I extend it, particularly

when the guidelines are as stiff as they are in this
instance.  But this is not a situation where Mr. Dyess
is entitled to consideration of accepting his
responsibility.

We have had this hearing for two days to put the
government to the test of its proof, which the
government has satisfied.  Mr. Dyess hasn't offered
any evidence to the contrary and did not get on the
stand and demonstrate that anything that was brought
forth was wrong.

He has lied in his debriefing, he has obstructed
justice by attempting to intimidate both witnesses in
the case and members of the law enforcement team. . .
.  [T]he Court cannot conceive of giving Mr. Dyess
acceptance of responsibility.  Mr. Dyess has fought
this thing all the way through with an in-your-face
attitude to everybody that is concerned, and I deny
that motion.

Tr. at 435-36.

A fair reading of the transcript of the original sentencing

hearing demonstrates that, in overruling Dyess's objection, the

court accepted the PSI's version of drug weights that were

attributable to Dyess.  See United States v. Walker, 29 F.3d

908, 912 (4th Cir. 1994) ("It is self-evident that in expressly

overruling Walker's objections to the PSR, the court was in fact

adopting the controverted PSR findings."); see also United

States v. Judd, No. 19-4540, 807 F. App'x 242, 244 (4th Cir.

Mar. 27, 2020) ("In expressly overruling Judd's objections to

the PSR, the court implicitly adopted both the controverted and

uncontroverted convictions relied upon by the Government and

described in the PSR."). Therefore, any argument that no specific drug weight was determined at sentencing is without merit.

Second, there is no merit to defendant's argument that, in its order of February 11, 2005, the court found Dyess to be responsible for only 1.5 kilograms of cocaine base. That is not what that order says. In determining that the original sentences handed down by Judge Haden were not undermined by the Hart misconduct, the court stated that "the drug quantities established by other witnesses who testified at the defendants' consolidated sentencing hearing significantly exceed 1.5 kilograms of crack cocaine." ECF No. 1001 at 5. While the order does state that defendant's original sentence was "based on 1.5 kilograms of crack cocaine," id. at 10, the court was referring to the threshold in the sentencing guidelines that would trigger a Base Offense Level of 38. Nothing more, nothing less. Therefore, the court's imprecise language should not be understood to suggest that the court reassessed the drug quantity attributable to Dyess. It did not.

Finally, even if called upon to reassess Judge Haden's assessment of the drug quantities attributable to Dyess, it would not simply accept the 1.5 kilograms crack cocaine threshold in the version of the guidelines used at Dyess's

sentencing.  The Fourth Circuit has made clear "that district courts may make additional findings on the drug quantities attributable to defendants in § 3582(c)(2) proceedings." Peters, 843 F.3d at 577.  According to the Peters court:

> The eligibility inquiry contemplated by § 3582(c)(2) may even require the court to supplement its findings in some circumstances.  Section 3582(c)(2) instructs courts to determine whether a retroactive Guidelines amendment lowers a defendant's sentencing range.  For an amendment to the Drug Quantity Table, this analysis hinges on whether the drug quantity attributable to the defendant exceeds or falls below the revised quantity threshold.  This inquiry is straightforward where the sentencing court found the defendant responsible for a precise amount (such as "X kilograms").  But sentencing courts sometimes attribute a range of quantities (such as "at least X kilograms") to defendants.  In these circumstances, a court deciding a § 3582(c)(2) motion may need to identify the attributable drug quantity with more precision to compare it against the new quantity threshold.

> In United States v. Mann, [709 F.3d 301 (4th Cir. 2013)] we declined to address the question of whether district courts may supplement their findings on attributable drug quantities.  Id. at 306.  We noted, however, that "our sister circuits agree that additional findings lie within a sentencing court's discretion."  Id.  The Seventh Circuit, for example, held that

> > nothing prevents the court from making new findings that are supported by the record and not inconsistent with the findings made in the original sentencing determination. Indeed, new findings may be necessary where, as here, the retroactive amendment to the guidelines altered the relevant drug-quantity thresholds for determining the defendant's base offense level.

> United States v. Hall, 600 F.3d 872, 876 (7th Cir.
> 2010).  The Eleventh Circuit also elaborated on the
> power of courts to make additional findings consistent
> with earlier ones:  "[I]f a district court found
> during the original sentence proceeding that 'at least
> X kilograms' were attributable to the defendant, it
> may not find . . . that 'less than X kilograms' were
> attributable; it may, however, find attributable X
> kilograms, or 2X kilograms, or 10X kilograms."  United
> States v. Hamilton, 715 F.3d 328, 340 (11th Cir.
> 2013).
>
> * * *
>
> We now join our sister circuits in holding that a
> district court may make additional findings on the
> drug quantity attributable to a defendant.  Such
> findings cannot contradict earlier ones and must be
> supported by the record.

Id. at 577-78.

Lance Williams, whose testimony was not called into

question by the Hart misconduct allegations, testified that he

had been involved in narcotics trafficking with Dyess for

approximately two and a half years and that he himself had

gotten approximately three kilograms of crack cocaine and two

kilograms of cocaine from Dyess.  See Sent. Tr. at 217-18.

According to Williams, when he needed crack cocaine, he would

ask Calvin.  See id. at 214.  Williams estimated that Dyess was

responsible for bringing 40 to 60 kilograms of cocaine and

cocaine base back to Charleston, West Virginia for distribution.

See id. at 219.  He testified about a trip to Texas with Calvin

31

and Benjamin Green where they got six kilograms of cocaine to bring back to West Virginia, see id. at 220, and another where they obtained "a garbage bag of marijuana." Id. at 221. Williams testified that he had observed Calvin cooking cocaine base between 40 and 50 times, estimating that he had cooked somewhere around 24 to 30 kilograms.[7] See id. at 222-23.

Eddie Ray Dyess, Jr., a co-defendant and Calvin's nephew, testified that he moved back to Charleston, West Virginia in the summer of 1996 and became involved in Calvin's drug business. See id. at 259-60. Eddie testified about travelling to New York with Calvin and others to obtain cocaine on three to four occasions and obtaining two to three kilograms of cocaine on each trip. See id. at 262-63. According to Eddie, the cocaine would be cooked into cocaine base once they returned to West Virginia. See id. at 263-64. Another time, in late 1997, Eddie observed Calvin with five pounds of marijuana packaged for distribution. See id. at 264-65. Eddie also saw Calvin give Dwayne Harris half a kilogram of crack cocaine on one occasion. See id. at 266-67. After Calvin was arrested, he asked Eddie to go retrieve money from a storage unit. See id. at 268.

---

[7] Williams testified that he had observed Dyess cooking cocaine base on a cookie sheet between 40 to 50 times and that a cookie sheet would hold approximately 600 grams. Therefore, the amount

Eddie did so and later realized that he had retrieved cocaine which he turned over to law enforcement.  See id. at 267-69.

Leon Mitchell testified that he had been in a drug conspiracy with Calvin Dyess where they sold crack cocaine and marijuana.  See id. at 306-07.  Mitchell estimated that conspiracy involved between 75 to 100 kilograms of powder cocaine "more than half of" which was converted into cocaine base and between 100 and 200 pounds of marijuana.  See id. at 307.

The court continues to believe that the record would support the drug quantities contained in the PSI and adopted by Judge Haden.  However, if called upon to make additional, more specific findings, the court would hold that a conservative estimate of the drug quantity attributable to Dyess is:  37.5 kilograms of cocaine base; 37.5 kilograms of cocaine, and 100 pounds of marijuana.  These drug quantities are a conservative estimate taken from the testimony of Leon Mitchell and the amounts are corroborated by the testimony of Lance Williams and Eddie Ray Dyess, Jr., the more than $300,000.00 in drug proceeds recovered from the backyard of Dyess's in-laws, and the drugs recovered from the storage locker.

---

he observed would be between 24 kilograms (600 x 40 ÷ 1000) and 30 kilograms (600 x 50 ÷ 1000).

Because even this reduced drug quantity exceeds 26.2 kilograms of cocaine base, Dyess's Base Offense Level remains a 38 and his guideline is unchanged.  Therefore, he is ineligible for a sentence reduction under any amendment to the sentencing guidelines, including Amendment 782.

IV.

On December 21, 2018, the First Step Act was signed into law.  See Pub. L. No. 115-391, 132 Stat. 5194 (2018).  The First Step Act applies the relief provided in the Fair Sentencing Act of 2010, which reduced the disparity in the treatment of crack and powder cocaine offenses, retroactively to eligible defendants.  Under the First Step Act, "a court that imposed a sentence for a covered offense" may "impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 were in effect at the time the covered offense was committed."  Id. at § 404(b).

To be eligible for a reduced sentence under the First Step Act, a defendant's sentence must not have been previously imposed or reduced in accordance with Sections 2 and 3 of the Fair Sentencing Act.  See id. at § 404(c).  In addition, a sentence may not be reduced if the defendant has made a previous motion for a reduction under the First Step Act that was denied

34

on the merits.  See id.  Furthermore, a court is not required to reduce a sentence under the First Step Act.  See id.

The First Step Act of 2018 "authorizes district courts to reduce the prison sentences of defendants convicted of certain offenses involving crack cocaine." Concepcion v. United States, 597 U.S. 481, 486 (2022).  "The Act allows a district court to impose a reduced sentence 'as if' the revised penalties for crack cocaine enacted in the Fair Sentencing Act of 2010 were in effect at the time the offense was committed." Id.  The United States Court of Appeals for the Fourth Circuit has confirmed that any sentence reduction under the First Step Act should be implemented pursuant to 18 U.S.C. § 3582(c)(1)(B).  See United States v. Wirsing, 943 F.3d 175, 185 (4th Cir. 2019).

The government concedes that Dyess is eligible for a reduction under the First Step Act because Count Two is a covered offense.  Even though, as discussed above, Dyess's guideline range would not change because of the quantity of drugs involved, he "was convicted of a covered offense and is thus eligible for consideration of relief under the First Step Act." United States v. Mays, Criminal Action No. 1:03-0726-MGL-1, 2023 WL 5155719, at *2-3 (D.S.C. Aug. 10, 2023) (finding defendant eligible for a reduced sentence under the First Step Act where guidelines remained unchanged but he was convicted of

a covered offense"); see also United States v. Gravatt, 953 F.3d
258, 263 n.2 (4th Cir. 2020) ("The First Step Act applies to
offenses, not conduct.") (citation and quotation omitted).
Count Two is a "covered offense" because it was committed before
August 3, 2010 and the applicable penalties were modified by
section 2 of the Fair Sentencing Act which increased the drug
quantities necessary to trigger mandatory minimum sentences
under 21 U.S.C. § 841(b)(1).  Specifically, the threshold
requirement to trigger the mandatory minimum sentence of five
years under 21 U.S.C. § 841(b)(1)(B) was increased from 5 grams
to 28 grams for cocaine base.  The Fair Sentencing Act also
increased from fifty to 280 grams the amount of cocaine base
necessary to trigger the ten-year mandatory minimum sentence.
Furthermore, defendant's sentence was not previously imposed or
reduced in accordance with the First Step Act nor has he made
another motion for a sentence reduction under the Act that has
been decided on the merits.  Retroactive application of the
First Step Act in defendant's case yields a statutory maximum
sentence of twenty years on Count Two.

In "adjudicating a motion under the First Step Act [a
district court] may consider other intervening changes of law
(such as changes to the Sentencing Guidelines) or changes of
fact (such as behavior in prison)."  Concepcion, 597 U.S. at

486.  As Concepcion makes clear, "when deciding to grant a First Step Act motions and in deciding how much to reduce sentences, courts have looked to postsentencing evidence of violence or prison infractions as probative."  Id. at 499.  "Moreover, when raised by the parties, district courts have considered nonretroactive Guidelines amendments to help inform whether to reduce sentences at all, and if so, by how much."  Id.

"[W]hen deciding a First Step Act motion, district courts bear the standard obligation to explain their decisions and demonstrate that they considered the parties' arguments."  Id. at 500-01.  "Of course, a district court is not required to be persuaded by every argument parties make, and it may, in its discretion, dismiss arguments that it does not find compelling without a detailed explanation.  Nor is a district court required to articulate anything more than a brief statement of reasons. . . .  Nothing in the First Step Act contravenes these background principles."  Id. at 501.  As the Court explained:

> The First Step Act does not require courts to expressly rebut each argument made by the parties.  In exercising its discretion, the court is free to agree or disagree with any of the policy arguments raised before it. . . .  All that the First Step Act requires is that a district court make clear that it reasoned through the parties' arguments.
>
> * * *
>
> Put simply, the First Step Act does not require a district court to accept a movant's argument that

evidence of rehabilitation or other changes in law
counsel in favor of a sentence reduction, or the
Government's view that evidence of violent behavior in
prison counsels against providing relief.  Nor does
the First Step Act require a district court to make a
point-by-point rebuttal of the parties' arguments.
All that is required is for a district court to
demonstrate that it has considered the arguments
before it.

* * *

The First Step Act does not require a district
court to be persuaded by the nonfrivolous arguments
raised by the parties before it, but it does require
the court to consider them.

Id. at 501-02.

In deciding motions under the First Step Act, "[t]he only
two limitations on district courts' discretion appear in §
404(c):  A district court may not consider a First Step Act
motion if the movant's sentence was already reduced under the
Fair Sentencing Act or if the court considered and rejected a
motion under the First Step Act."  Id. at 496.  Therefore, a
defendant only gets one shot at a reduced sentence under the
First Step Act.  See United States v. McCullers, CRIMINAL NO.
4:07cr49, 2024 WL 3084421, at *3 (E.D. Va. June 21, 2024)
(denying motion for sentence reduction under the First Step Act
as successive).

Concepcion directs a district court to "recalculate a
movant's benchmark Guidelines range. . . to reflect the

retroactive application of the Fair Sentencing Act." Id. at 498
n.6. "[T]he First Step Act directs district courts to calculate
the Guidelines range as if the Fair Sentencing Act's amendments
had been in place at the time of the offense." Id. "That
Guidelines range 'anchor[s]' the sentencing proceeding." Id.
(quoting Peugh v. United States, 569 U.S. 530, 541 (2013)); see
also United States v. Reed, 58 F.4th 816, 824 n.6 (4th Cir.
2023). A "district court may then consider postsentencing
conduct or nonretroactive changes in selecting or rejecting an
appropriate sentence, with the properly calculated Guidelines
range as the benchmark." Concepcion, 597 U.S. at 498 n.6; see
also United States v. Troy, 64 F.4th 177, 181 (4th Cir. 2023)
("[T]he First Step Act does not permit a district court to
recalculate a defendant's benchmark Guidelines range in any way
other than to reflect the retroactive application of the Fair
Sentencing Act. Arguments based on other changes in law must be
considered after determining the benchmark Guidelines range that
will anchor the proceeding.") (cleaned up).

As noted above, given the drug quantities and enhancements
applied at sentencing, defendant was sentenced based upon a
Total Offense Level of 46 and a Criminal History of III which
yields a guideline range of life imprisonment. However, if the
Fair Sentencing Act's amendments had been in place at the time

of the offense, Dyess's guideline range on Count Two would have been capped at the statutory maximum sentence of 240 months. See USSG § 5G1.1(a) ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence."). Furthermore, "[i]f the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment[8], then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment." USSG § 5G1.2(d). Therefore, the advisory guideline range is 348 months, consisting of 240 months on Count Two and 108 months on Count Three, the money laundering count which is unaffected by the First Step Act. See United States v. Winter, Criminal No. 2:93cr90-1, 2023 WL 3539432, at *2 (E.D. Va. May 18, 2023) (noting that § 5G1.2(d) instructs a district court to "stack consecutive sentences when the count with the greatest punishment authorizes a maximum punishment that is lower than the high end of the advisory Guideline range"); United States v. Fleming, Criminal No.: ELH-08-086, 2022 WL

---

[8] The Fourth Circuit has observed that "[t]otal punishment is the precise sentence determined by the sentencing judge from within the appropriate guidelines range." United States v. Hinson, No. 13-4011, 533 F. App'x 276 (4th Cir. July 18, 2013) (cleaned up).

743955, at *24-25 (D. Md. Mar. 11, 2022) (noting that where a guideline range remained life imprisonment, the court could impose sentences consecutively up to statutory maximums); see also ECF No. 1391 at 3 (Dyess conceding as much).

The Fourth Circuit has also made clear that, in reducing a sentence under the First Step Act, a court may vary from the guidelines range.  See United States v. Smith, 75 F.4th 459, 467 (4th Cir. 2023) (affirming district court's denial of motion for sentence reduction under the First Step Act even though sentence imposed represented "a significant upward variance from [defendant's] post-First Step Act Guidelines range"); see also United States v. Spotts, Criminal Action No. 3:98-00047-01, 2019 WL 6521981, at *3 (S.D.W. Va. Dec. 3, 2019) ("[T]he First Step Act authorizes the Court to sentence the defendant anew and enter a variance in cases it deems appropriate.") (Chambers, J.); United States Hardnett, Case No. 3:03cr212, 2019 WL 5445887, at *7 (E.D. Va. Oct. 24, 2019) (recognizing that a variance sentence may be imposed when granting relief under the First Step Act).

In imposing a sentence in the first instance or reducing one under the First Step Act, a court must consider the factors set forth at 18 U.S.C. § 3353(a).  These factors include (i) "the nature and circumstances of the offense and the history and

41

characteristics of the defendant"; (ii) the need for the
sentence imposed to reflect the seriousness of the offense, to
promote respect for the law, and to provide just punishment for
the offense; to adequately deter criminal conduct; to protect
the public from further crimes of the defendant; and to provide
the defendant with needed educational or vocational training,
medical care, or other correctional treatment in the most
effective manner; (iii) the kinds of sentences available and the
applicable sentencing ranges; (iv) "the need to avoid
unwarranted sentence disparities among defendants with similar
records who have been found guilty of similar conduct"; (v) the
sentencing guidelines; and (vi) "the need to provide restitution
to any victims of the offense."  18 U.S.C. § 3553(a).

Despite Dyess's eligibility for a reduction, the government
nevertheless strongly opposes a reduction in his sentence
arguing that Dyess is not the type of offender the First Step
Act was thinking about.  The government has a point.

As the government points out, rather than reducing unwanted
sentencing disparities, a reduction in Dyess's sentence would
lead to disparities between Dyess and other similarly-situated
defendants whose offenses involved drugs other than cocaine

base.[9]  While Dyess is eligible to have his sentenced reduced, a drug trafficker whose base offense level was a 38 based upon drugs other crack cocaine is ineligible for relief.  However, the government's concerns in this regard are mitigated somewhat by the fact that, even where a defendant is eligible for a reduced sentence, a court is under no obligation to grant a sentencing reduction.  See United States v. Davis, 961 F.3d 181, 193 (2d Cir. 2020) ("Thus, while we can understand the government's frustration that it could not have foreseen new, retroactive hurdles to come, it was Congress's decision to confer Section 404 eligibility broadly — and thereby to upset the government's ex ante expectations about what sentences certain defendants would serve.  But Congress also gave district courts the discretion to deny sentencing reductions to eligible defendants where appropriate.").

Consideration of the § 3553(a) factors does not necessarily demonstrate that Dyess is deserving of a sentence reduction. First, the nature and circumstances of Dyess's offense were quite serious given the large quantity of drugs that were trafficked as well as the fact that firearms were involved.  The

---

[9] Any disparity in the sentences between Dyess and his codefendants is largely explained by the differences in drug quantities, sentencing enhancements, criminal history, and

court cannot ignore that Dyess is eligible for relief only
because of a charging decision the United States Attorney made
under the law at that time and not the actual quantity of crack
cocaine involved.  That discretionary charging decision was made
without the government knowing what the potential ramifications
of that decision would be years later.  And the record in this
case is clear that the government could have easily charged
defendant with the threshold quantities needed to trigger a
potential life sentence.  For example, at his plea hearing,
Dyess admitted that his crime involved 5 kilograms or more of
cocaine[10] and 50 grams or more of cocaine base.  See Plea Tr. at
16.  Had the indictment merely tracked these admissions, Dyess's
statutory sentencing exposure would still have been 10 years to
life and he would be ineligible for relief.  See, e.g., United
States v. Littlejohn, CRIMINAL CASE NO. 1:90-cr-00231-MR-WCM-5,
2024 WL 171955, at *3 (W.D.N.C. Jan. 16, 2024) (denying sentence
reduction in part where "[g]iven the prodigious quantities of
powder cocaine involved in his offense, it appears to the Court
that it is not speculative to deduce that the Defendant would
still have been prosecuted pursuant to § 841(b)(1)(A), even if

---

Dyess's failure to receive a downward adjustment for acceptance
of responsibility.

the provisions of the Fair Sentencing Act of 2010 had been in place"). In addition, the government could have filed an information pursuant to 21 U.S.C. § 851 to trigger the enhanced penalties based upon Dyess's earlier federal drug conviction. See PSR at ¶ 92.

Second, although Dyess was only 25 years of age when he pled guilty, his criminal history is extensive. By his own admission, he had been a drug dealer since he was fourteen years old.

> **Dyess's Attorney:** [T]his man is 25 years of age. From the time he was 14 years old, he was in the drug business, he was selling drugs. We are not making any arguments he did anything else, that was his livelihood. His livelihood was on this side of the street. They were the enemy. From 14 years of age up, they were the enemy. Now - -
>
> **Court:** They, you mean law enforcement.
>
> **Attorney:** Police officers, the establishment.

See Sent. Tr. at 430. Dyess was convicted of a federal drug offense at the age of 18 for which he was sentenced to a term of imprisonment of fifteen months. Dyess's federal conviction and sentence did not serve as a wake-up call to him. His supervised release was revoked and, upon release from his revocation

---

[10] A defendant charged with 5 kilograms or more of cocaine (not cocaine base) is subject to a term of imprisonment of 10 years to life. See U.S.C. § 841(b)(1)(ii)(II).

sentence, he became involved in the drug conspiracy at issue in this case.

It is also significant to the court that Dyess received an enhancement for obstructing justice at his original sentencing for his attempts to intimidate witnesses.  There is also the matter of his involvement in the false affidavits submitted by Benjamin Green and Lori Cummings after he was sentenced.  As the appeals court noted "[i]n April and May of 2004, both Green and Miss Cummings recanted the allegations contained in the affidavits, they named Calvin Dyess as the affidavits' author, and testified that Calvin Dyess instructed Green and Miss Cummings to sign them."  Dyess, 478 F.3d at 233.  Even from behind bars, Dyess was able to persuade others to violate the law.

Furthermore, the court has serious concerns that Dyess, even twenty-five plus years later, continues to minimize his role in these offenses and his own background.  For example, in a letter sent to the court earlier this year, Dyess wrote that he has "never been a violent type" and has "never shot a gun before."  See ECF No. 1486.  These assertions are plainly contradicted by the evidence in the record.  See PSI ¶¶ 72, 73, 74, and 79.  Those paragraphs set out multiple instances of

domestic battery and physical abuse by defendant which he did

not deny.  Ursala testified about that abuse at the hearing:

> A:   Calvin and I were in a fight and he was mad at me
> and he was hitting me and yelling at me and strangling
> me and smacking me, kicking me and he went to the
> closet and he got a gun out and he threatened me with
> it."
>
> Q:   What did you do?
>
> A:   I just said, please, stop.
>
> Q:   What happened?
>
> A:   He put it down and he hit me a few more times and
> then I got up and I ran out the front door and I was
> close to my grandmother's house, so I walked over
> there and I called the police.
>
> Q:   Did you file charges?
>
> A:   Yes.
>
> Q:   What happened with those charges?
>
> A:   I dropped them.
>
> Q:   Why is that?
>
> A:   Because we got back together.  He promised he
> wouldn't do it any more.
>
> Q:   Did there come a time when you talked with B.D.
> Gore from the West Virginia State Police about
> Calvin's drug activities?
>
> A:   Yes, ma'am.
>
> Q:   Approximately when did that occur?

A:   I'm not sure.  A year ago.[11]

Q:   What led up to you talking to B.D. Gore?

A:   I was trying to leave Calvin, he would never let me leave, and I was frustrated, and I didn't know what to do.

Q:   When you say he wouldn't let you leave, how did he keep you?

A:   He would threaten me, he would hit me, he would threaten my family.  I was afraid of him.

Sent. Tr. at 17-18.

As far as Dyess's assertion that he had never shot a gun, Ursala testified about an occasion on the early morning hours of New Year's Day in 1997 where Calvin woke her up at around 2:00 a.m.  See Sent. Tr. at 19.  According to Ursala, Calvin "was covered in mud and he had little splatters of blood on him." Id.  Calvin told Ursala that he had shot somebody and told her to get up and go hide the casings.  See id.  Lance Williams also testified regarding this incident.  See id. at 224-26.  He confirmed that he and Calvin had fired guns at someone who pulled a gun on them although he stated that they did not hit anybody.  See id. at 225, 236-38.  Paragraph 34 of the PSI, to which Dyess did not object also recounts this shooting.

To sum it up, Calvin continues to be untruthful.

_____

[11] Ursala talked to Gore prior to return of the indictment in this case.  Therefore, her testimony on these points is not

Furthermore, Dyess's performance while incarcerated is cause for concern. He has had approximately 35 disciplinary infractions while incarcerated in this case. A number of these infractions (at least five) involve the possession of drugs and/or alcohol, including two infractions within the past year. And, in 2018, Dyess was found guilty of possessing a dangerous weapon. While defendant argues that his infractions should not support a decision to deny a sentence reduction, see ECF No. 1396, the court disagrees. His record of infractions while incarcerated suggests that he continues to pose a threat to the community.

There are, however, several factors which weigh in Dyess's favor. He is older now, in his 50's, and because of his age he is considered a lower risk for recidivism. He has completed numerous educational courses while incarcerated for which he is to be commended. In addition, although not raised by the parties, it appears that Dyess's criminal history category would be II instead of III if sentenced today by operation of Amendment 821 to the sentencing guidelines. Notwithstanding the change to his criminal history category, defendant's guideline range would remain the same. Finally, according to Dyess, he

---

undermined by the Hart misconduct allegations.

49

has strong family support to assist him in his efforts to obtain a law-abiding lifestyle should he be released.[12]

Defendant was young when he committed the offenses of conviction and he has now spent more than half of his life in federal custody.  And, while the drug conspiracy in this case was serious in terms of the amount of drugs and the number of participants, it did not, insofar as the court knows, involve the type of violent conduct that is often found in sentences where life imprisonment is imposed.  For all these reasons, the court believes that it can impose a sentence that is less than life imprisonment but will still satisfy the statutory objectives of sentencing.

Because the indictment did not allege a specific drug quantity for Count Two, the statutory maximum that would apply to that count is twenty years.  However, to the extent defendant argues the court must reduce his sentence on Count Two to the revised statutory maximum pursuant to the First Step Act, that argument fails.  See United States v. Woods, No. 20-6508, 2023 WL 4888872, at *3 (4th Cir. Aug. 1, 2023).  "[D]istrict courts need not reduce any sentence under the First Step Act."  United

---

[12] Dyess has also raised the COVID-19 pandemic as a reason for a sentence reduction.  The court has considered defendant's argument but does not find it persuasive.  At this point, COVID

50

States v. Reed, 58 F.4th 816, 824 (4th Cir. 2023) (emphasis added).  This includes a situation where a district court refuses to reduce a sentence to the revised statutory maximum. See id. at 822.

The court has considered the record in this case, including the original Presentence Investigation Report (PSI), original Judgment and Commitment Order and Statement of Reasons, materials received from the Probation Office, and any materials submitted by the parties on this issue.  The court has also considered the applicable factors under 18 U.S.C. § 3553(a).

Based on the foregoing considerations, defendant's motion for a reduced sentence is **GRANTED** and it is further **ORDERED** that defendant's previous sentence on Count Two is reduced to **396 months**.  The court believes that a 396-month sentence, while a significant reduction from the term of life Dyess is currently serving, is sufficient but not greater than necessary to satisfy the objectives of sentencing, including the need to deter others from similar conduct.

Because defendant received a sentence of life imprisonment, the court did not impose a term of supervised release at his original sentencing on this count.  "Under the unitary theory of

---

has become a fact of life and the BOP has taken significant measures to manage its risks.

sentencing, custodial and supervised release terms should be
treated 'as components of one unified sentence.'"  United States
v. Morsley, NO. 5:93-CR-102-FL-7, 2020 WL 4511485, at *4
(E.D.N.C. Aug. 5, 2020)(quoting United States v. Venable, 943
F.3d 187, 193-94 (4th Cir. 2019)).  For this reason, courts have
concluded that it is permissible to impose a term of supervised
release for the first time in a First Step Act proceeding.  See
id. at *4.  As the United States Court of Appeals for the
Eleventh Circuit explained:

> Edwards contends that the First Step Act only empowers
> a court to "reduce" a sentence, not to add to one, as
> he insists the district court did here when, in the
> course of reducing his sentence from "life
> imprisonment without release" to "262 months . . . or
> time served," it imposed a new term of mandatory
> supervised release.  Because a supervised-release term
> hadn't been imposed as part of his original life-
> without-release sentence, Edwards asserts that the
> district court exceeded its statutory authority under
> the First Step Act when it included that term in his
> modified sentence.
>
> We disagree.  Edwards erroneously fixates on the
> supervised-release "component" of his modified
> sentence. . . .  Section 404(b)'s focus is the
> "sentence" itself—the unitary thing—and it empowers
> the district court to "reduce[]" that "sentence."  So
> long as a defendant's overall "sentence" is "reduced,"
> therefore, it seems to us that the authority that §
> 404(b) confers is broad enough to empower a court to
> impose a new term of supervised release, it being one
> aspect of the "sentence."  Here, Edwards's overall
> sentence was undoubtedly reduced.  Edwards started out
> with a sentence of "life imprisonment without
> release," and ended up with a sentence of "262 months
> . . . or time served" plus eight years of mandatory

52

supervised release.  Under any reasonable
understanding of the term, that modification
constituted a sentence "reduc[tion]."   .

United States v. Edwards, 997 F.3d 1115, 1120-21 (11th Cir.

2021).

21 U.S.C. § 841(b)(1) authorizes a court to impose a

lifetime term of supervised release.  See United States v.

Perez, 22 F.4th 430, 438 (4th Cir. 2022).  The court finds that

a term of supervised release is necessary to deter future

criminal conduct and assist defendant with his transition into

the community.  This is particularly true in light of Dyess's

lengthy period of incarceration, criminal history, and numerous

disciplinary infractions.  The court emphasizes that it would

not exercise its discretion to reduce defendant's term of

imprisonment in any amount without the availability of a

significant term of supervision to follow release.  In other

words, the court concludes that a sentence of less than life

imprisonment without supervised release would not satisfy the

statutory purposes of sentencing.  For this reason, the court

imposes a term of supervised release of five years subject to

the mandatory conditions of supervision.[13]  The five-year term of
supervised release is to run concurrent to the three-year term
of supervised release Judge Haden imposed on the money
laundering count.  See ECF No. 388.

In deciding upon the variance sentence herein imposed, the
court considered all of the factors set forth in 18 U.S.C. §
3553(a).  The court concluded that the sentence imposed is
sufficient, but not greater than necessary, to meet the
objectives of sentencing set forth in these authorities.  In
deciding to vary above the benchmark guidelines, the court finds
significant defendant's post-sentencing conduct including his
numerous serious disciplinary incidents while incarcerated.
While defendant has taken a number of classes while in prison in
order to prepare himself for release from incarceration, his
success in this regard is undermined by his atrocious record of
disciplinary incidents.  One of the § 3553(a) factors a court is
directed to consider in imposing sentence is "the nature and
circumstances of the offense and the history and characteristics

_____

[13] The court believes that certain discretionary conditions of
supervision that it often imposes for similarly situated
defendants would aid Dyess's reintroduction to society and aid
the probation office in supervising him.  However, the Fourth
Circuit has indicated that the court is without authority to
impose those conditions.  See United States v. Newby, 91 F.4th
196, 200 (4th Cir. 2024) (holding that court may not impose new

of the defendant". 18 U.S.C. § 3553(a)(1). Another factor a court must consider is "the need for the sentence imposed . . . to protect the public from further crimes of the defendant". 18 U.S.C. § 3553(a)(2)(C). Defendant's criminal history as reflected in the PSR must be considered along with his post-sentencing conduct. Consideration of the entire record leads the court to conclude that defendant's conduct, including during his lengthy incarceration, weighs in favor of the 396-month sentence.

The court acknowledges that the offenses of conviction were serious. However, the court believes that a sentence of 396 months plus five years of supervised release will adequately reflect the seriousness of Dyess's conduct, promote respect for the law, provide just punishment for his offenses, and afford adequate deterrence to criminal conduct.

The Clerk is **DIRECTED** to send a copy of this Memorandum Opinion and Judgment Order to counsel of record, the Federal Public Defender, the United States Attorney for both the Southern District of West Virginia and the Eastern District of Virginia, the United States Marshal for the Southern District of

---

discretionary conditions of supervised release in a First Step Act proceeding).

West Virginia, and to the United States Probation Office for
forwarding to the Sentencing Commission and Bureau of Prisons.

    It is SO ORDERED this 14th day of November, 2024.

         ENTER:

David A. Faber
Senior United States District Judge